# UNITED STATES DISTRICT COURT EASTERN DISTRICT AT GREENVILLE TENNESSEE

JOHN DEARING,

Plaintiff

V

KADRON BULLINGTON, individually and her official capacity;

CRAIG JARNIGAN, individually and in his official capacity;

BOBBY BULLINGTON, individually and in his official capacity;

DAN ARMSTRONG, in his official capacity;

CITY OF MORRISTOWN TENNESSEE;

TENNESSEE DEPARTMENT OF SAFETY AND HOMELAND SECURITY;

HAMBLEN COUNTY TENNESSEE SHERIFFS DEPARTMENT;

JOHN DOES 1-3 (Hamblen County Deputies)

Defendants.

CIVIL ACTION NO.

## I.INTRODUCTION

This is a civil rights action brought pursuant to 42 USC 1983 for violations of plaintiffs constitutional rights under the 4th 5th 6th and 14th amendments. On March 27th 2023 defendants used excessive force against Plaintiff a 63 year old small statured business owner breaking his neck and causing life threatening injuries. Defendants then engaged in a systematic cover up

including evidence tampering fabrication of charges and denial of medical care.

Plaintiff John Dearing, proceeding pro se, brings this civil rights action against

Defendants pursuant to 42 U.S.C. 1983 for violations of his constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and respectfully alleges as follows:

# I.INTRODUCTION

1. This is a civil rights action arising from the brutal and unlawful assault on Plaintiff by law enforcement officers on March 27 2023, which resulted in a broken neck and permanent life-threatening injuries.

2. Plaintiff, a 63-year old small-statured HVAC contractor and business owner, was acting as a designated driver for his spouse when he was unlawfully stopped, threatened, denied legal counsel, and subjected to excessive force that broke his neck.

3.Following this assault, Defendants engaged in a systematic cover-up including; evidence tampering, fabrication of criminal charges, conspiracy between family members within law enforcement, prosecutorial misconduct in withholding exculpatory evidence, and ongoing deprivation of Plaintiff's property rights.

4. As a direct result of Defendants actions, Plaintiff suffers constant pain and has lost his ability to adequately maintain and perform his life's work, faces ongoing financial devastation, and endures permanent physical disabilities that threaten his life expectancy.

5. Video evidence from multiple sources documents these constitutional violations, and despite Defendants attempts to tamper with and withhold this evidence, it proves the systematic nature of their misconduct.

## II. JURISDICTION AND VENUE

1. This court has subject matter jurisdiction pursuant to 28 U.S.C. 1331 (federal question jurisdiction and 28 U.S.C. 1343) (civil rights jurisdiction)

2. This action arises under 42 USC 1983 and the 4th 5th 6th and 14th amendments to the United States constitution.

3. Venue is proper in this district pursuant to 28 USC 1391-(B)because all events giving rise to this action occurred within the Eastern District of Tennessee.

4. This court has the authority to grant declaratory relief compensatory damages punitive damages and attorney's fees pursuant to 28 USC 2201-2202 and 42 USC 1988.

## III. PARTIES

## A. PLAINTIFF

5. Plaintiff John Dearing is a citizen and resident of Tennessee at all times relevant to this complaint Plaintiff was 63 years old of small physical stature and the owner and sole operator of an HVAC contracting business Plaintiff is now 65 years old and continues to suffer from the injuries inflicted by the defendants.

## DEFENDANTS

6. Defendant KADRON BULLINGTON is and was at all relevant times a Tennessee State Trooper employed by the Tennessee Department of Safety and Homeland Security at all relevant times, She acted under color of state law within the scope of her employment, she is sued in both her individual capacity and her official capacity. She is the daughter of defendant BOBBY BULLINTON.

7. Defendant CRAIG JARNIGAN is and was at all relevant times a police officer employed by the Morristown Police Department. At all relevant times, he acted under color of state law within the scope of his employment. He is sued in both his individual capacity and his official capacity.

8. Defendant BOBBY BULLINGTON is and was at all relevant times a Tennessee State Trooper employed by the Tennessee Department of Safety and Homeland Security and the father of Defendant Kadron Bullington.

At all relevant times, he acted under color of state law. He is sued in both his individual and his official capacity.

9. Defendant DAN ARMSTRONG is and was at all relevant times the District Attorney for Hamblen County Tennessee, responsible for prosecuting criminal cases and ensuring constitutional due process including the disclosure of exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963). He is sued in his official capacity.

10. Defendants JOHN DOES 1-3 are Hamblen County Sheriff's Deputies whose identities are currently unknown to Plaintiff but who participated in the constitutional violations described herein. At all relevant times, they acted under color of state law. Plaintiff will seek leave to amend this complaint to include their true names when discovered through the litigation process. They are sued in their individual capacities.

# C. GOVERNMENTAL DEFENDANTS

11. Defendant CITY OF MORRISTOWN, TENNESSEE, Is a municipal corporation organized under the laws of the state of Tennessee. The city is responsible for the operation of the Morristown Police Department and for the policies practices customs training and supervision of its police officers including Defendant Jarnigan.

12. Defendant TENNESSEE DEPARTMENT OF SAFETY AND HOMELAND SECURITY Is an agency of the state of Tennessee responsible for the operation of the Tennessee Highway Patrol and for the policies practices customs training and supervision of state troopers including defendants Kadron Bullington and Bobby Bullington.

13. Defendant HAMBLEN COUNTY TENNESSEE, Is a political subdivision of the state of Tennessee responsible for the operation of the Hamlen County Sheriff's Department and for the policies, practices, customs, training, and supervision of its deputies including the John doe defendants.

# IV. FACTUAL ALLEGATIONS

## A. The unlawful Traffic Stop (March 27 2023)

14. On March 27th 2023 plaintiff was the designated driver for his intoxicated spouse responsibly transporting her home from a store where he had purchased a six pack of beer for her.

15. Defendant kadron Bullington was stationary at a gas station (BP in ALPHA) approximately 1 mile from where plaintiff was located at ( Zoomers  gas station at 11-E and HWY 160)

## A. Plantiff's Background and Circumstances on March 27 2023

16. On March 27 2023 plaintiff was a 63 year old small statured man who owned and operated HVAC contracting business as a sole proprietor.

17. Plaintiff's work required significant physical capability including accessing crawl spaces working in attics and performing new construction installations.

18. On the evening of March 27 2023 plaintiff was acting as a designated driver for his intoxicated spouse.

19. Plaintiff and his spouse had visited a store where Plaintiff purchased a six pack of beer for her.

20. Plaintiff had not consumed any alcohol and was completely sober.

21. Plaintiff was responsibly driving his spouse home when the events described herein occurred.

## B. The Unlawful Traffic Stop

22. At approximately 9:40 PM on March the 27th 2023 defendant Kadron Bullington was stationary at a gas station in Morristown TN over a mile away.

23. Plaintiff was located at a different gas station Zoomers, approximately 1 mile away from defendant Bullington's location.

24. From her stationary position at the gas station defendant Bullington could not have observed Plaintiff or his vehicle.

25. Despite this physical impossibility defendant Bullington left the gas station and drove at a high rate of speed approximately 95 mph for approximately 3 miles purportedly searching for a vehicle she claimed was speeding.

26. Video evidence from defendant Bullington's dash Cam shows that Plaintiff and his vehicle were not visible on the video footage prior to the traffic stop making it impossible for defendant Bullington to have observed plaintiff committing any traffic violation.

27. As Defendant Bullington approached Plaintiffs vehicle at a high rate of speed, in the dark, she stated on video, "yeah that's him," despite the fact that she could not have visibly identified plaintiffs vehicle or determine the gender of the driver under the existing conditions.

28. Defendant Bullington's official police report states that plaintiff was traveling 78 mph in a 50 mile per hour zone.

29. However Defendant Bullington later stated on video that Plaintiff was traveling 76 mph in a 50 mile per hour zone demonstrating an inconsistency that reveals the falsity of her stated justification for the stop.

30. In truth, Defendant Bullington had no reliable radar or visual observation of Plaintiff's speed and had no probable cause to believe plaintiff was speeding.

31. The dash Cam video that purportedly documents this incident contains a date stamp showing 03/28/23 when the actual date of the incident was March 27th 2023 suggesting the video evidence has been tampered with or manipulated.

32. The first 30 seconds of audio from the dash Cam video which would document why Defendant Bullington left the gas station and what information she actually possessed about Plaintiffs alleged traffic violation has been deliberately redacted and withheld.

33. Defendant Bullington initiated a traffic stop of Plaintiffs vehicle without probable cause or reasonable suspicion and violation of the 4th amendment.

## C. The Prolonged Detention and Threats (13 Minute Timeline)

34. Following the unlawful stop, Plaintiff remained seated in his vehicle while Defendant Bullington approached and began interacting with Plaintiff.

35. Plaintiff spouse was present in the passenger seat. She was visibly intoxicated and a six pack of beer that plaintiff had just purchased for her was located near her position in the vehicle.

36. Defendant Bullington's police report falsely claimed that Plaintiff had a case of beer near the center console misrepresenting both the quantity of alcohol versus 6 pack and its location, center console, versus near the passenger apparently to bolster a false narrative that the plaintiff had been drinking and driving.

37. During the encounter Plaintiff repeatedly and clearly asserted his Fifth Amendment right to remain silent by stating" I don't answer questions."

38. Plaintiff also clearly and unambiguously invoked his sixth amendment right to counsel by stating "I need a lawyer."

39. In direct violation of 6th Amendment rights defendant Bullington responded to Plaintiff's request for counsel by stating "no you don't."

40. Defendant Bullington then engaged in a pattern of coercive threats designed to force Plaintiff to waive his constitutional rights including

a. Threatening plaintiff, that if he agreed to take field sobriety test, he would "get to sleep in his own bed tonight," but if he refused the test, he would not be able to "sleep in his own bed tonight";

b. Threatening Plaintiff that if he did not cooperate she would arrest him.

c. Threatening Plaintiff's spouse, telling her to "stand over there out of the road unless she wanted to help her get Plaintiff out of his vehicle."

41. When Plaintiffs spouse suggested to defendant Bullington that she would help get plaintiff out of the vehicle, Defendant bulletin initially stated "we can't force him out ma'am," acknowledging that the forcible removal was not appropriate or legally justified.

42. Despite this acknowledgment, defendant Bullington subsequently did exactly what she had admitted she could not do, she facilitated the forcible and violent removal of Plaintiff from his vehicle.

43. Throughout this encounter which lasted approximately 13 minutes, Plaintiff remained seated peacefully in his vehicle.

44. At no point during these 13 minutes did Plaintiff engage in any violent aggressive or threatening behavior.

45. At no point during these 13 minutes did Plaintiff pose any threat to officer safety.

46. At no point during these 13 minutes did Defendant Bullington inform Plaintiff that he was under arrest and requested Plaintiff to step out of his vehicle to take field sobriety test, to which Plaintiff refused to take any field sobriety test.

47. Plaintiff a 63 year old man of small stature posed no physical threat to the multiple law enforcement officers who were present at the scene.

48. During this 13 minutes, Defendant Bullington had ample time and opportunity to:

a. Attempt a verbal de-escalation;

b. Contact a supervisor for guidance;

c. Explain to Plaintiff that field sobriety tests were voluntary in nature;

d. Employ any of numerous alternatives to physical force.

49. Instead of employing any de-escalation techniques Defendant Bullington called for backup from both the Morristown Police Department and the Hamblen County Sheriff's Department.

## D. The Excessive Force and Resulting Catastrophic Injuries

50. After the 13 minute encounter during which Plaintiff peacefully asserted his constitutional rights while seated in his vehicle Defendant Bullington opened Plaintiffs car door.

51. Defendant Craig Jarnigan, an officer with the Morristown Police Department who had responded to Defendant Bullingtons call for backup then grabbed Plaintiff by the wrist.

52. Defendant Jarnigan pulled plaintiff from the vehicle with such force and violence that he threw plaintiff onto the pavement.

53. The force used by Defendant Jarnigan in pulling plaintiff from the vehicle and throwing him to the pavement was so excessive and violent that it broke Plaintiff's neck.

54. This use of force also caused lacerations to Plaintiff's hands and face.

55. Plaintiff's daughter Mandy Dearing was present at the scene and witnessed the excessive force being used against her father.

56. Upon seeing the brutal treatment of her father Mandy yelled "quit hurting my dad" in an attempt to stop the violence.

57. In response to Mandy's outcry Defendant Bullington dismissively stated, "he's alright" even as Plaintiff lay injured with a broken neck and bleeding.

58. Only after this excessive force had been applied and Plaintiff had been seriously injured did Defendant Jon Doe from Hamblen County Sheriff's Department, inform Plaintiff that he was under arrest after asking Plaintiff if he had any weapons on his person, to which Plaintiff replied " I don't answer any questions."

59. The force used by Defendants Jarnigan and Bullington was objectively unreasonable under the circumstances because:

a. Plaintiff was a 63 year old of small physical stature and posed no threat to officers.

b. Plaintiff had not engaged in any violent, aggressive, or actively resistant behavior.

c. Multiple law enforcement officers from three separate agencies were present providing overwhelming numerical superiority;

d. Officers had 13 minutes to employ de-escalation techniques but chose not to do so;

e. Plaintiff was merely exercising his constitutional rights to remain silent and request counsel which cannot justify the use of force;

f. The significant disparity in age size and strength between Plaintiff and the younger, larger, law enforcement officers made the level of force use grossly excessive;

g. No exigent circumstances existed that would have justified the immediate use of violent force;

h. The severity of the force used "sufficient to break a human neck" was grossly disproportionate to any legitimate government interest;

i. Breaking a person's neck can cause death and the use of such force against a non violent non threatening individual was objectively unreasonable.

60. When Defendant Bullington subsequently opened the police car door to remove Plaintiff at the jail she stated in a threatening matter, "now do you want to cooperate?" "it ain't gonna do you no good not to cooperate now is it?"

61. This statement demonstrates that the use of force against Plaintiff was punitive and retaliatory in nature, intended to punish Plaintiff for asserting his constitutional rights rather than being necessary for any legitimate law enforcement purpose such as officer safety.

## E. Deliberate Indifference to Serious Medical Needs

62. After using excessive force that broke Plaintiff's neck and caused visible bleeding and lacerations to his hands and face defendants observed that Plaintiff was seriously injured.

63. Despite the obviously serious nature of Plaintiffs injuries, including a broken neck that could be potentially life-threatening, Defendants deliberately failed to seek or provide or arrange for any medical attention for Plaintiff.

64. When Plaintiff was brought to the jail, a jail nurse observed blood on Plaintiff's face and asked Defendant Bullington, "what's with the blood?"

65. Defendant Bullington responded in a casual and dismissive manner stating, "oh we had to pull him out" and took no action to ensure that plaintiff received medical evaluation or treatment.

66. The jail nurses inquiry demonstrates that Plaintiffs injuries were visible and obviously serious enough to warrant immediate medical attention.

67. Defendant Bullington's dismissive response demonstrates a deliberate indifference to Plaintiffs serious medical needs.

68. A broken neck is an extremely serious medical condition that can result in paralysis, death, or other catastrophic consequences and any reasonable law enforcement officer would know that such an injury requires immediate medical evaluation and treatment.

69. Defendants failure to provide medical care for Plaintiffs broken neck and other injuries, caused Plaintiff additional unnecessary pain suffering and worsening of his condition.


## F. Unlawfull Detention of Plaintiff's Spouse

70. Plaintiff's spouse was a passenger in Plaintiff's vehicle at the time of the traffic stop.

71. Plaintiff's spouse was not suspected of having committed any criminal offence.

72. Plaintiff's spouse posed no threat to officer safety and was not interfering with the officers' activities.

73. Despite the lack of any legal justification, Hamblen county sheriff's deputies handcuffed and detained plaintiffs spouse.

74. This unlawful detention was done to intimidate witnesses to the excessive force used against Plaintiff and to control the scene to facilitate the cover up of Defendants constitutional violations.

75. There was no probable cause, reasonable suspicion, or any legal justification for the detention and handcuffing of Plaintiff's innocent spouse.

## G. Additional Violations of Property Rights

76. Following the unlawful arrest defendant Bullington improperly authorized Plaintiff's daughter's boyfriend, who was a complete stranger to law enforcement and an unauthorized individual to drive plaintiffs personal vehicle without Plaintiffs knowledge or permission.

77. Defendant Bullington had no legal authority to give such permission and doing so exposed plaintiff to potential liability and demonstrated Defendants continuing pattern of disregard for plaintiffs constitutional and property rights.

78. During the arrest defendants seized plaintiffs lawfully owned Ruger pistol.

79. Plaintiffs criminal case was ultimately resolved with a plea to reckless endangerment which is not a firearms related offense and does not prohibit firearm ownership.

80. Despite the resolution of the criminal case and the absence of any legal basis for continued retention Defendants continue to unlawfully hold Plaintiffs firearm.

82. Plaintiff has been deprived of his property without due process of law.

## H. Conspiracy to Fabricate Charges

83. Video evidence captured at the jail shows a conversation between Defendant Kadron Bullington and her father Defendant Bobby Bullington, both of whom are Tennessee State troopers.

84. During this recording of conversations Defendant's Kadron Bullington and Bobby Bullington, discussed what criminal charges they wanted to bring against Plaintiff.

85. During this conversation between Defendant's Kadron Bullington and Bobby Bullington,  they lacked any evidence or probable cause to support any of the charges they were discussing against Plaintiff.

86. This conversation which was captured on video while in the custody and control of the Tennessee Department of Safety and Homeland Security demonstrates a conspiracy between family members within the same law enforcement agency to fabricate criminal charges against Plaintiff.

87.The charges discussed and ultimately filed were intended to:

a. Retaliate against plaintiff for asserting his constitutional rights;

b. Provide a post -hoc justification for the excessive force that had already been used;

c. Intimidate Plaintiff from pursuing his civil rights;

d. Cover up the constitutional violations committed by Defendants.

88. Following this conspiracy Plaintiff was charged with multiple criminal offenses including DUI, firearms charges, no seat belt violation, speeding, violation of implied consent, and resisting arrest.

89. These charges were filed without probable cause and in bad faith.

## I. Systematic Evidence Tampering and Spoliation

90. Video evidence that Defendants provided to plaintiff show systematic irregularities that demonstrate tampering with evidence:

91. The dash Cam video from defendant Kadron Bullington's vehicle which was in the exclusive custody and control of the Tennessee Department of Safety and Homeland Security shows a date stamp of 03/28/23 when the actual date was March 27th 2023.

92. This incorrect date stamp suggests that the video evidence has been tampered with, manipulated, recreated, or altered, while in Defendants exclusive custody and control.

93. The body camera video from Defendant Kadron Bullington which was in the exclusive custody and control of the Tennessee Department of Safety and Homeland Security completely lacks any date or time stamp whatsoever.

94. Body cameras used by law enforcement agencies automatically record date and time stamps as part of their basic functionality and the absence of such stamps suggest deliberate removal or tampering.

95. The first 30 seconds of audio from the dash Cam video have been deliberately redacted.

96. The first 30 seconds of audio would have documented why defendant Bullington left the gas station, what information she actually possessed about any alleged traffic violation and whether she had any legitimate basis for pursuing and stopping Plaintiff.

97. The redaction of this critical audio evidence demonstrates a deliberate attempt to conceal the unlawful nature of the traffic stop.

98. These irregularities and alterations occurred while the video evidence was in the exclusive custody and control of the Tennessee Department of Safety and Homeland Security.

99. The pattern of tampering, incorrect date stamps, missing time stamps, and redacted audio demonstrates either:

a. Deliberate tampering with evidence to obstruct Plaintiffs civil rights claims and cover up constitutional violations; or

b. Such grossly negligent and reckless handling of critical evidence as to constitute deliberate indifference to Plaintiff's constitutional right to due process and access to evidence.

100. Either deliberate tampering or deliberate indifference to evidence preservation violates Plaintiffs rights under the 14th amendment.

101. Defendants deliberately delayed providing video evidence to plaintiff waiting until only five days before the statute of limitations for filing a civil rights lawsuit would expire.

102. Defendants charged plaintiff $156 to obtain copies of video evidence that should have been provided with minimal or no charge under public records laws.

103. This delay in providing evidence was a deliberate attempt to prevent Plaintiff from timely discovering the constitutional violations and filing a civil rights lawsuit within the applicable statute of limitations.

104. The systematic tampering with evidence demonstrates Defendants consciousness of guilt and awareness that their conduct violated Plaintiffs constitutional rights.

## J. Prosecutorial Misconduct and Brady Violation

105. Following the incident on March 27th 2023 Plaintiff was charged with multiple criminal offenses and faced criminal prosecution.

106. Plaintiff retained a criminal defense attorney to represent him in the criminal proceedings.

107. Plaintiffs criminal defense attorney made formal written request to the district attorneys office for access to the body camera and dash cam video evidence.

108. Plaintiff has documentary evidence of this request in his possession.

109. The video evidence was clearly exculpatory and favorable to the Plaintiffs defense because it would have shown:

a. That the traffic stop was unlawful as Defendant Bullington could not have observed plaintiff committing any traffic violation;

b. That defendant Bullington made threats and engaged in coercive conduct;

c. That Plaintiff properly and repeatedly asserted his constitutional rights to remain silent and to have council;

d. That Plaintiff was not violent, aggressive, or threatening at any point;

e. That excessive force was used against plaintiff without justification;

f. That defendant Bullington explicitly denied plaintiffs request for legal counsel and violation of his sixth amendment rights;

g. That there was no probable cause for any of the charges filed against Plaintiff;

h. That defendants Kadron Bullington and Bobby Bullington discussed fabricating all the charges, were there was no probable cause.

i. That defendant Bullington's statements about the incident contained false and inconsistent information.

110. Despite the formal written request from Plaintiffs criminal defense attorney and despite the clearly exculpatory nature of the video evidence the

District Attorney's office refused to provide Plaintiffs attorney with access to this evidence prior to trial.

111. This refusal to provide exculpatory evidence violated Plaintiffs constitutional rights under Brady vs Maryland 373 US (1963 ).

112. The District Attorney's refusal was deliberate and knowing, as evidenced by the documented written request from Plaintiff's council.

113. The withholding of this exculpatory video evidence was part of a coordinated effort among law enforcement and prosecutorial agencies to cover up the constitutional violations committed against Plaintiff and to coerce plaintiff into pleading guilty rather than proceeding to trial where the video evidence would expose Defendants misconduct.

114. Without access to the video evidence that would have proven the charges against him were false and that his constitutional rights have been systematically violated, plaintiff was unable to adequately defend himself against the criminal charges.

115. Facing the prospect of conviction on serious criminal charges including DUI and firearms offenses and lacking access to the exculpatory video evidence that would have supported his defense, Plaintiff felt coerced into entering a plea agreement.

116. Plaintiff ultimately entered a plea to the reduced charge of reckless endangerment in order to resolve the criminal case and avoid the substantial risk of conviction on more serious charges when he had been denied access to evidence that could have exonerated him.

117. Only after the criminal case was resolved and after Plaintiff paid $156 for copies of the video evidence, did Plaintiff finally obtain access to the videos.

118. The videos were provided to Plaintiff only five days before the statute of limitations for filing a federal civil rights lawsuit would have expired.

119. Upon viewing the video evidence that had been withheld from him during the criminal proceedings Plaintiff confirmed that:

a. The videos were highly exculpatory and would have supported his defense to the criminal charges;

b. The videos documented the constitutional violations as described in this complaint;

c. The charges against Plaintiff had been filed without probable cause;

d. Defendants had engaged in a systematic pattern of misconduct, evidence tampering, and conspiracy.

120. The brady violation directly caused Plaintiff to suffer:

a. Inability to adequately defend himself in criminal proceedings;

b. Substantial legal expenses for criminal defence;

c. A criminal conviction and criminal record;

d. Substantial legal expenses for criminal defence;

e. Emotional distress and anxiety from being prosecuted without access to exculpatory evidence;

f. Reputational harm from the criminal charges and conviction.


## K. Catastrophic and Permanent Injuries

121. As a direct and proximate result of the excessive force used by Defendants Jarnigan and Bullington plaintiff suffered a broken neck and cuts to his face and hands.

122. This injury to plaintiff cervical spine has resulted in severe permanent and life threatening complications.

123. Plaintiff now suffers from constant severe, neck pains, and headaches.

124. Plaintiff cannot engage in even basic physical work as he was able before this assault.

125.

126.

127. Medical professionals have confirmed that pain in his neck and head are direct result of neck injury inflicted by the Defendants.

128.

129. Prior to March 27th 2023, Plaintiff was a working HVAC contractor fully capable of performing all aspects of his trade including:

a. Accessing and working in crawl spaces Beneath buildings;

b. Accessing and working in attics;

c. Performing new construction HVAC installations

d. Engaging in physical labor required for HVAC repair and maintenance work.

130. As a direct result of the neck injury and associated difficulties caused by Defendants, Plaintiff can no longer perform these essential functions of new construction jobs of his profession.

131. Plaintiff is now 65 years old, operates his HVAC business as a sole proprietor with no employees, and has no one who can perform this work in his place.

132. Because Plaintiff can no longer access crawl spaces, work in attics or perform new construction installations, Plaintiff has been forced to turn down substantial amounts of work.

133. Plaintiff is forced to regularly decline job opportunities because he is physically unable to perform the work required.

134. As a direct result of his inability to perform significant categories of HVAC work Plaintiffs business has suffered severely.

135. Plaintiff has lost substantial income and continues to lose income on an ongoing basis due to his inability to accept and perform work that he was fully capable of performing before defendants broke his neck.

136. At 65 years of age Plaintiff has limited working years remaining and his inability to perform his profession for the remainder of his working life represents a catastrophic loss of earning capacity.

137. Plaintiffs injuries have destroyed his ability to earn a living and the only profession he knows and has practiced for decades.

138. In addition to the economic devastation, Plaintiff suffers constant physical pain and disability.

139. Plaintiff's neck pain affect every moment of every day, making even simple activities exhausting and frightening.

140. Plaintiff lives with the constant fear that his life is being shortened by the injury Defendants inflicted on him.

141. Plaintiff requires ongoing medical treatment and monitoring for his neck injury resulting in substantial ongoing medical expenses.

142. All of these catastrophic injuries and damages flow directly from Defendants use of excessive force on march 27 2023.

## V. CAUSES OF ACTION

## COUNT 1: EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT

## 42 U.S.C. 1983

Against Defendants Kadron Bullington and Craig Jarnigan

(Individual Capacity)

143. Plaintiff incorporates by reference all proceeding allegations as if fully set forth here in.

144. The 4th amendment to the united states constitution prohibits government officials from using excessive force during an arrest, seizure, or other infractions with citizens.

145. At all times relevant to this complaint Defendants Kadron Bullington and Craig Jarnigan were acting under color of state law within the scope of their employment as law enforcement officers.

146. Defendant Craig Jarnigan acting under color of state law, used objectively unreasonable and excessive force against Plaintiff when he grabbed Plaintiff by the wrist and violently pulled him from his vehicle with such force that he threw plaintiff onto the pavement breaking Plaintiffs neck.

147. Defendant Kadron Bullington acting under color of state law, participated in facilitated, and directly contributed to this excessive force by opening Plaintiffs car door and coordinating with Defendant Jarnigan to forcibly and violently remove Plaintiff from the vehicle.

148. The force used by defendants Jarnigan and Bullington was objectively unreasonable under the circumstances for the following reasons:

a. Plaintiff was 63 years old of small physical stature and posed no physical threat whatsoever to the law enforcement officers present;

b. Plaintiff had not engaged in any violent, aggressive, or actively resisted behavior at any point during the encounter;

c. Multiple law enforcement officers from three separate agencies tennessee highway patrol Morristown police department in Hamblen County sheriff's Department were present at the scene, providing overwhelming numerical superiority and rendering any use of significant force unnecessary;

d.  Officers had approximately 13 minutes during which Plaintiff remained peacefully seated in his vehicle to employ de-escalation techniques, contact supervisors, or pursue alternatives to physical force;

e.  Plaintiff was merely exercising his clearly established constitutional rights to remain silent and to request legal counsel and the exercise of constitutional rights cannot provide justification for the use of of force;

f. The significant disparity in age size physical strength and training between plaintiff (a 63 year old small stature civilian) and the younger larger professionally trained law enforcement officers made any significant use of force unnecessary and excessive;

g.  No exigent circumstances existed that would have justified the immediate use of violent force;

h.  Plaintiff had not been informed that he was under arrest therefore could not have been resisting arrest;

i.  The severity of the force used- force sufficient to break a human neck was grossly and outrageously disproportionate to any legitimate government interest;

j. Breaking a person's neck creates a substantial risk of death, paralysis, or other catastrophic injury, and the use of such dangerous force against a non-violent non-threatening elderly individual was objectively unreasonable under clearly established law.

149. As demonstrated by defendant Bullington's threatening statement to plaintiff after the use of force ("now you want to cooperate? it ain't gonna do you no good not to cooperate now is it? ), the force was not used for any legitimate law enforcement purpose but rather was punitive and retaliatory in nature intended to punish plaintiff for asserting his constitutional rights.

150. The right to be free from excessive force during a seizure was clearly established at the time of Defendants conduct and any reasonable law

enforcement officer would have known that using force sufficient to break the neck of a 63 year old non-violent individual violated the 4th amendment.

151. As a direct and proximate result of the excessive force used by defendants Jarnigan and Bullington Plaintiff suffered and continues to suffer:

a. A broken neck (cervical spine fracture);

b. Severe constant neck and head pain.

c. Lacerations and other physical injuries;

d. Complete loss of ability to perform his HVAC contracting work;

e. Severe economic losses including lost income, lost business opportunities, and loss of earning capacity;

f. Ongoing and substantial medical expenses;

g. Constant physical pain and suffering;

h. Severe emotional distress, anxiety, and mental anguish;

i. Loss of enjoyment of life;

j. Permanent disability;

k. Shortened life expectancy;

## PRAYER FOR RELIEF

Wherefore plaintiff requests that this Court;

a. Awards damages for pain and suffering, mental anguish, present and future cost of medical bills in the amount of $800,000.00 from all Defendants of this claim.

b. Claim for injury, Pain and suffering, lost revenue, attorneys fees, and bonds;

c.  All court costs and attorneys fees taxed to all defendants of this claim;

d.  Grants any further relief deemed just and proper.

e.  Punitive damages to correct all officers training and certification.

f.  Expungement of all  criminal charges relating to this claim.

 I declare under penalty of perjury that the foregoing is true and correct.

Jury demand

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted

Date 01-02-2026

John Dearing /Pro Se

2121 Pleasant Ridge Rd

Talbott, Tennessee 37877

865-803-5400

Jbdearing@hotmail.com